1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| GERALD HEIDINGER, | ) | No. C 07-0429 MMC (PR) |
| Petitioner, | ) | **ORDER DENYING PETITION FOR** |
| | ) | **WRIT OF HABEAS CORPUS; DENYING** |
| v. | ) | **CERTIFICATE OF APPEALABILITY;** |
| | ) | **DIRECTIONS TO CLERK** |
| P.D. BRAZELTON, Warden, | ) | |
| Respondent. | ) | |

11

12

13

14

15

16

17        Before the Court is the above-titled petition for a writ of habeas corpus, filed by

18   petitioner Gerald Heidinger pursuant to 28 U.S.C. § 2254, challenging the validity of a

19   judgment obtained against him in state court.  Respondent has filed an answer to the petition,

20   and petitioner has filed a traverse.[1]

21                              **I.  PROCEDURAL HISTORY**

22        In 2002, in Monterey County Superior Court, petitioner was charged by information

23   with assault with a firearm (Pen. Code, § 245 subd.(a)(2), Count One)[2]; inflicting corporal

24

25        [1]  Petitioner initially brought this action against James A. Yates, the former warden of
     Pleasant Valley State Prison, where petitioner is incarcerated.  Pursuant to Rule 25(d) of the

26   Federal Rules of Civil Procedure, P.D. Brazelton, the current warden of Pleasant Valley State
     Prison, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

27

28        [2]  Except as otherwise specified, all statutory references herein are to the California
     Penal Code.

United States District Court

For the Northern District of California

injury on a cohabitant (Pen. Code § 273.5, subd. (a), Count Two); and possession of a concealable firearm by a felon (Pen. Code § 12021.1, Count Three).  People v. Heidinger, 2004 WL 2181786, at *1 (Cal. Ct. App. Sept. 29, 2004).  In addition, the information alleged petitioner had suffered three prior felony convictions within the meaning of Penal Code section 667, subdivisions (b)-(i) and 1170.12 (California's Three Strikes Law), and a prior serious felony conviction within the meaning of Penal Code section 667, subdivision (a)(1). Id.  With respect to Count Two, the information alleged petitioner used a firearm within the meaning of Penal Code section 12022.5.  Id.  Before trial, the court struck Count Three.  Id.

On April 9, 2003, a jury found petitioner guilty of Count Two.  Id.  With respect to Count One, the jury found him guilty of the lesser offense of misdemeanor assault (Pen. Code § 240).  Id.  In addition, with respect to Count Two, the jury found not true the gun use allegation.  Id.  Petitioner waived a jury trial on the strike priors, and the trial court thereafter found those allegations true.  Id.

On May 28, 2003, the trial court denied petitioner's motion to strike the three priors and sentenced him to a prison term of 25 years to life.  Id.

On September 29, 2004, the California Court of Appeal remanded the case for resentencing on the assault count and otherwise affirmed the judgment of conviction.  People v. Heidinger, 2004 WL 2181786 (Cal. Ct. App. Sept. 29, 2004).  By separate order entered the same day, the California Court of Appeal summarily denied habeas relief.  (Pet. Ex. ER at 20.)  On December 22, 2004, the California Supreme Court denied review in both the direct appeal and habeas action.  (Pet. Ex. ER at 21-22.)

On August 3, 2005, petitioner filed a habeas petition in Monterey County Superior Court, which was denied on September 16, 2005.  (Pet. Ex. ER at 23-25.)

On October 19, 2005, petitioner filed another habeas petition in Monterey County Superior Court, which was denied on November 28, 2005.  (Pet. Ex. ER at 26-28.)

On January 13, 2006 petitioner filed a habeas petition in the California Court of Appeal, which was denied on March 10, 2006.  (Pet. Ex. ER at 29.)

On April 7, 2006, petitioner filed a habeas petition in the California Supreme Court,

2

1   which was denied on December 13, 2006.  (Pet. Ex. ER at 30.)

2          On June 25, 2007, petitioner filed the instant petition for a writ of habeas corpus..

3          On March 17, 2008, petitioner filed another habeas petition in the California Supreme

4   Court, which was denied as untimely on August 27, 2008.  (Resp. Sept. 26, 2008 Mot. to

5   Dismiss, Ex. 3.)

## II.  STATEMENT OF FACTS

7          The California Court of Appeal found the facts underlying petitioner's conviction to

8   be as follows:

*The Prosecution Case*

In 2001, 21-year old Victoria Goad worked with [petitioner] at his motorcycle shop, E-Z. Rider.  They began a dating relationship a couple of months later. At the end of 2001, or the beginning of 2002, they began living together.

In May 2002, [petitioner] and Goad went to Salinas so that Goad's friend, Craig Markart, could fix the engine of [petitioner's] "RV."  The RV was parked near Markart's shop.

On June 2, Goad and [petitioner] were in the RV.  They discussed cleaning it. [Petitioner] left to get a light bulb for his truck.  Goad had a migraine and so she stayed in the RV to take a nap.  According to Goad, she awoke when [petitioner] hit her multiple times in the back of her head with his fist. [Petitioner] held her in a chokehold with his arm around her neck.  Goad had trouble breathing.  She struggled until she was facing [petitioner]. Whereupon, he put his fingers in her mouth and she bit down on his fingers.  In return, he bit her forehead.

Goad testified that after [petitioner] stopped biting her, he went to the front of the RV and came back with a gun.  [Petitioner] pointed the gun at her head. Goad told [petitioner] that she would not say anything if he let her go. [Petitioner] responded, "yeah, right you ain't going to say anything." [Petitioner] told Goad to sit down.

Eventually, according to Goad, she went towards the bathroom to try to get away from the gun.  [Petitioner] went into the bathroom through another door. As [petitioner] went in, Goad shut the door on his leg and ran towards the front of the RV.  [Petitioner] came up behind her and started pulling her hair.  He had placed the gun in a box on a chair next to the front door.  Goad picked up the gun, pointed it at [petitioner] and told him to let her go.  [Petitioner] reached for the gun, whereupon Goad threw the gun down to the bottom of the stairs that led down to the door.  At this time, she managed to escape from the RV and fell through the door onto the ground.  Goad saw Markart's girlfriend, Kelly Green, by Markart's shop.  She ran towards her saying that she was scared, that [petitioner] had a gun and she wanted to get away.  Green told her to get into her truck.  As they were leaving, Goad saw [petitioner] getting into a "white GMC."  Goad was concerned for her safety so she told Green to take back roads in case [petitioner] tried to follow them.

On cross-examination, Goad admitted that she pleaded guilty to spousal abuse in August 1990.  She explained that she had a relationship with Joe Silva, the victim in that case.  She admitted to hitting him in the face, but maintained that she was defending herself.

Goad testified that [petitioner] had been violent towards her on a prior occasion when he choked her until she passed out.  At that time, she did not call the police because she was afraid.

Kelly Green testified that she saw Goad running across the field from the area of the motor home.  Goad was yelling, "get out of here" and something about "he had a gun."  She was hysterical and wanted to get away.  Goad was not wearing any shoes, there was blood coming from her mouth and her hair was "pretty messed up."  Green told Goad to get into her truck.

As they were leaving, Green saw [petitioner] come out of the "motor home," get into a white truck and leave.  He went in the opposite direction to which Goad and Green were going.  On cross-examination, Green admitted that she did not see anything in [petitioner's] hands when he came out of the motor home.

As Goad and Green were driving, Goad complained that her head hurt.  She had a bite mark on her forehead.  As Goad was running her fingers through her hair, "chunks" of hair came out.

Green took Goad to her house in Prunedale.  She cleaned up Goad, checked from where she was bleeding, and lent her a sweater and some shoes.  Goad said that she was tired.  Green became concerned that she might have a concussion.  Green called the police and the police called an ambulance.

James Seelig's testimony corroborated Green's description of the events leading up to Green driving Goad away.  On cross-examination, he admitted that he did not see a gun in [petitioner's] hands.[3]

Testimony from a Natividad Hospital emergency room physician who examined Goad at 10:15 p.m., confirmed that Goad had a bite mark above the left eye, an abrasion on her forehead, bruising around the cheekbones, bruising and swelling under each eye, and tenderness in the back of her neck.  The physician did not note in his report that there was any hair loss.

Police Officer Stephen Sparks talked to Goad at the Natividad Hospital the evening of June 2.  Essentially, she told the same story as her testimony, except that she said that [petitioner] bit her before she bit him.  Goad told him that [petitioner] was strangling her; he pulled her up and bit her on the forehead.  In addition, Goad told him that as [petitioner] was biting her, "'he somehow placed one of his fingers in [her] mouth which prompted her to bite it very hard.'"  Goad told Sparks that when [petitioner] was hitting her, he said something about her not cleaning the RV.  Goad did not tell Sparks anything about her hair coming out.

---

[3] James Seelig was a friend of Green's boyfriend, and was present that day.  (RT 530, 605-08.)

4

After Sparks talked to Goad, he had other officers go the motor home. [Petitioner] was not there. Sparks went to the motor home at about 10:30 or 11 p.m. [Petitioner] was not there and Sparks could not find a gun. The motor home was in general disarray.

*The Defense Case*

Fifty-one year old [petitioner] testified in his own defense that on June 2, he and Goad were supposed to clean the motor home. However, Goad had a migraine. She took a nap in the motor home while he went to lunch. When he returned Goad said that her headache was terrible. [Petitioner] left to get a light bulb from his truck. When he returned, between four and five o'clock, he asked Goad how she felt. She said she was a little better. [Petitioner] made a "wisecrack" that if she waited until the sun went down, it would be too dark for her to work. Goad jumped up on her knees on the bed, and "started hollering 'don't you yell at me when I've got a headache.'" [Petitioner] told her that she was the one screaming. Goad continued to scream. [Petitioner] went towards the bathroom, holding his hands in the air and telling Goad to "shut up." The next thing that he knew, Goad bit his hand, and "flipped back on the bed like she was trying to tear it off." He went forward.

[Petitioner] yelled for Goad to let go. He pushed hard on her upper chest to get away. As he did, she bit harder. As Goad was flailing at his face, he "took her one arm, her left arm, with [his] right hand and pinned it to the bed hollering for her the whole time 'let go,' 'let go,' 'let go.'" Next, when she did not let go, he "tried to head butt her a little bit." Finally, he "put the skin of her forehead in [his] teeth" and "just applied more pressure, more pressure, more pressure, until she finally let go."

Immediately, [petitioner] got up and went into the dining room. Goad came out of the bedroom and looked at him. He said something to the effect of "'you b-i-t-c-h, man.'" Goad walked by. The next thing he knew was that he was "cracked up side the head." Goad lunged for the door, the door flew open and Goad fell "flat on her melon." Goad got up and screamed for help. She started running across the field.

[Petitioner] saw Goad go toward Markart's shop. He was going to drive over to see what was going on, but as he pulled out of the driveway, he saw Goad in Green's car. Goad was not looking at him. He "took off." Despite the fact that [petitioner] had "been assaulted" he did not go to the police.

[Petitioner] had no recollection of pulling Goad's hair. Furthermore, he denied that he had a gun. A photograph of his hand taken that night showed a tooth mark going through the fingernail of his left hand; several fingers showed teeth marks. According to [petitioner], besides the bites on his fingers, he suffered a scratch on his forearm and cheek, both his earlobes were torn enough to bleed, and there was a bruise on his head.

[Petitioner] testified to an incident in which Goad went into a rage, threw a cell phone, kicked him in the side and "slugged" him. An employee of his, Robert Provole, yelled at Goad to be quiet. Goad began screaming at Provole. At one point, she took a soda can and threw it at Provole's head. When Goad calmed down, she apologized and said, "I think I'm done raging now."

[Petitioner] claimed that his right shoulder was permanently disabled in August 1999 from a motorcycle accident.  He maintained that as a result, he had limited mobility and was unable to throw a punch with that arm.

[Petitioner] admitted being convicted of five felonies in 1983, including rape, oral copulation, and lewd and lascivious conduct.  He explained that it was "with a gal five days before her 14th birthday which in the eyes of the law made her a child."  Although the conviction was for forcible rape, [petitioner] denied using any force.  In addition, [petitioner] denied that he had choked Goad on a previous occasion.

*Rebuttal Evidence*

Goad acknowledged that [petitioner] had a problem with his shoulder.  She claimed, however, that he was able to lift it.  Goad's mother testified that she had worked for [petitioner] and had never seen him have a problem raising his right arm above his head.

After closing argument, among other instructions, the court instructed the jury on self-defense pursuant to CALJIC Nos. 5.30 (Self-defense against assault), 5.31 (Assault with fists-When use of deadly weapon not justified), 5.50 (Self-defense-Assailed person need not retreat), 5.51 (Self-defense-Actual danger not necessary), 5.52 (Self-defense-When danger ceases), 5.54 (Self-defense by an aggressor), 5.55 (Plea of self-defense may not be contrived), and 5.56 (Self-defense-Participants in mutual combat).

The case went to the jury on the afternoon of April 8.  During deliberations, the jury sent several notes to the court.  First, the jury asked for the testimony of the police officer on "who bit who first"; when the photographs of [petitioner's] fingers were taken; and who took them.  After discussing these questions with counsel, it was agreed that the testimony of the officer would be read.  With respect to the photographs, the jury was informed that there was no evidence about who took the photographs and they would not receive any new evidence.  They were informed that the photographs were taken during the evening of June 2, 2002.  [Petitioner's] testimony relating to this was read to the jury.

In another note, the jury asked the following questions: "Self Defense-Does that exonerate the defendant from assault or battery charge?  Define: Corporal injury v. Battery."

Defense counsel asserted that as to the self-defense question the answer should be yes.  The court responded, "exonerate's what I do to bail.  The answer to the question I believe is in the definition of assault and battery in that self-defense, if it applies, any force in–that is used in lawful self-defense is lawful use of force, not an unlawful use of force.  Something like that."  The court stated that it would draft something.  Ultimately, the court responded to the jury as follows: "Self defense is defined in the instructions.  I will provide you with all the instructions so that you can take them back and review them at your leisure.  I'm not going to try to ad-lib on that.  They are carefully grafted [ sic ] instructions that deal with all aspects of the self-defense law.  [¶] The other instructions that you're given, that deal with the offenses, for example, make reference to whether or not–what the elements are, what's required in order to establish the offenses that are charged and the lesser included offenses.  [¶] Then the fourth question is 'define corporal injury versus battery.'  I guess as

6

opposed to battery. And again, I'm going to go ahead and give you the instructions rather than try to give you a short answer to that. The instructions are carefully worded, thoroughly worded, and understandable. I think once you read those you may not have any further questions. [¶] Once you have reviewed the applicable instructions, if you have further questions please let us know."

The court reread CALJIC No. 1.01 to the jury, instructing them not to single out any particular sentence or point in an instruction, and to consider the instruction as a whole, and in light of all the others.

At 10 a.m. on June 9, the jurors returned a verdict acquitting [petitioner] of assault with a firearm and the attendant personal use allegation. Instead, the jury found him guilty of the lesser included offense of assault on count one (Pen. Code, § 240), and the count two charge of corporal injury to a co-habitant. (Pen. Code, § 273.5).

People v. Heidinger, 2004 WL 2181786, at *1-4 (Cal. Ct. App. Sept. 29, 2004).

## III. DISCUSSION

A.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases"

or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, on state habeas review, the state courts did not reach the merits of the claims petitioner raises in the instant petition. The state Court of Appeal, however, in its opinion on direct review, addressed three of the claims petitioner raises here. The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). As to the claims for which there is no reasoned opinion available, the United States Supreme Court has recently clarified that a federal habeas court, in applying the review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state court, and that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d). See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

B.      Petitioner's Claims

In the petition filed June 25, 2007, petitioner asserts the following grounds for relief: (1) actual innocence of the charged crimes; (2) instructional error; (3) denial of conflict-free counsel; (4) ineffective assistance of trial counsel; (5) violation of the right to a jury trial; (6) prosecutorial misconduct; (7) sentencing determinations made by the judge rather than the jury; (8) sentence enhancements based on constitutionally infirm prior convictions; (9) cumulative error; (10) disproportionate sentencing amounting to cruel or unusual punishment; and (11) ineffective assistance of appellate counsel. The Court addresses each claim in turn, including any sub-claims contained therein.

1.      Actual Innocence

Petitioner claims he is "actually innocent" of the charge under Penal Code section 273.5(a) (Count Two) because he did not "illegally injure" Goad and because his relationship with Goad did not "fulfill requirements" of the "domestic violence statute." (Pet. at 6 & Attach. A at 7.) To the extent petitioner asserts a freestanding claim of actual innocence, the claim is not cognizable on federal habeas. See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.") The Court, however, construes petitioner's "actual innocence" claim as a claim that his convictions are unsupported by sufficient evidence.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324. For purposes of determining such claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable

**United States District Court**
For the Northern District of California

to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319 (emphasis in original). Where the record supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. <u>Id.</u> at 326. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. <u>Id.</u> at 324.

Penal Code section 273.5(a) provides in relevant part: "Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition is guilty of a felony, . . . ." Cal. Pen. Code § 273.5(a). Here, there was sufficient evidence upon which the jury could have based findings that: (1) petitioner and Goad were cohabitants; and (2) petitioner inflicted upon Goad "corporal injury resulting in a traumatic condition."

First, as to the requisite relationship, under California law:

> The term cohabitant has been interpreted broadly to refer to those living together in a substantial relationship–one manifested, minimally, by permanence and sexual or amorous intimacy. The element of permanence in the definition refers only to the underlying substantial relationship, not to the actual living arrangement. Permanence does not require exclusivity in either the relationship or the living arrangement. For purposes of criminal liability under section 273.5, a defendant may cohabit simultaneously with two or more people at different locations, during the same time frame, if he maintains substantial ongoing relationships with each and lives with each for significant periods.

<u>People v. Taylor</u>, 118 Cal. App. 4th 11, 18-19 (2004) (internal quotations, citations, and alteration omitted); <u>see</u> <u>Jackson</u>, 443 U.S. at 324 n.16 (holding, for purposes of claim of insufficient evidence, substantive elements of offense are defined by state law). Goad testified she had been living with petitioner since late December 2001 or early January 2002, i.e., at least five months before the assault. (RT 556-58.) She described the relationship as an "intimate sexual relationship." (<u>Id.</u> at 556.) Petitioner himself testified he and Goad dated since November 2001 and lived together "[o]n and off." (<u>Id.</u> at 756.) He also testified he and Goad "were looking to buy some property" together. (<u>Id.</u> at 757.) Viewing the

evidence in the light most favorable to the prosecution, a rational trier of fact could find petitioner and Goad's relationship was "substantial" and "sexual" for a "significant" period, Taylor, 118 Cal. App. 4th at 19, and that their living arrangement and relationship made them cohabitants for purposes of Penal Code section 273.5(a).

Second, as to infliction of "corporal injury resulting in a traumatic condition," the phrase "traumatic condition" is defined for purposes of Penal Code section 273.5 as "a condition of the body, such as a wound, or external or internal injury, . . . whether of a minor or serious nature, caused by a physical force." Cal. Penal Code § 273.5(c) (emphasis added). Goad testified that, as a result of petitioner's attack, she suffered two black eyes, bruises, and a bite mark. (RT 588-89.) She identified a photograph showing the bite mark on her forehead, and she stated that, at the time of trial, she still felt numb in the area of the bite. (Id. at 588.) Green confirmed the existence of the injuries, noting that, following the assault, she saw blood coming from Goad's mouth, a bite mark on Goad's forehead, "chunks" of Goad's hair falling out, and a lump on Goad's head. (Id. at 534-36, 538.) The physician who examined Goad also observed the bite mark, abrasions, and bruising. (RT 547-50; see United States v. Hall, 419 F.3d. 980, 986 (9th Cir. 2005) ("Bruising is a 'traumatic condition' for purposes of [section 273.5].") Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find petitioner's actions, for purposes of section 273.5(a), caused "corporal injury" .

Accordingly, petitioner is not entitled to habeas relief on this claim.

2.      Instructional Error

Petitioner claims the trial court misinstructed the jury in four ways. Specifically, petitioner claims the trial court erroneously: (1) instructed the jury on self-defense under CALJIC Nos. 5.54 and 5.56; (2) instructed the jury on propensity evidence under CALJIC Nos. 2.50.02 and 2.50.1; (3) omitted CALJIC No. 5.53; and (4) omitted a special instruction on Goad's prior conviction. (Pet. at 6 & Attach. A at 12-23.)

The Court addresses each such claim in turn.

United States District Court
For the Northern District of California

a.      CALJIC Nos. 5.54 and 5.56

Petitioner claims the trial court erred in instructing the jury on self-defense pursuant to CALJIC No. 5.54 (Self-Defense by an Aggressor)[4] and CALJIC No. 5.56 (Self-Defense– Participants in Mutual Combat)[5]. Petitioner argues that these instructions, by using the words "clearly informed," require an attacker to give "explicit verbal notification" of withdrawal, in contradiction of California law, which permits the attacker to manifest withdrawal solely by conduct. See People v. Hernandez, 111 Cal. App. 4th 582, 590 (2003) (holding attacker may withdraw verbally or "solely by conduct").[6]

---

[4] The jury was instructed under CALJIC No. 5.54 as follows:

The right of self-defense is only available to a person who initiated an assault if he or she has done all of the following: [¶] He or she has actually tried, in good faith, to refuse to continue fighting; [¶] He or she has <u>clearly informed</u> his or her opponent that he or she wanted to stop fighting; [¶] And he or she has <u>clearly informed</u> his or her opponent that he or she has stopped fighting. [¶] After he or she has done these three things, he or she has the right to self-defense as [sic] if his or her opponent continues to fight.

(RT 850-51) (emphasis added).

[5] The jury was instructed under CALJIC No. 5.56 as follows:

The right of self-defense is only available to a person who engages in mutual combat if he or she has done all the following: [¶] He or she has actually tried, in good faith, to refuse to continue fighting; [¶] He or she has <u>clearly informed</u> his or her opponent that he or she wants to stop fighting; [¶] He or she has <u>clearly informed</u> his or her opponent that he or she has stopped fighting. [¶] And he or she has given his or her opponent the opportunity to stop fighting. [¶] After he or she has done these four things, he or she had the right to self-defense if his or her opponent continues to fight.

(RT 851) (emphasis added).

[6] In People v. Hernandez, the California Court of Appeal found former CALJIC Nos. 5.54 and 5.56 to be inaccurate statements of the law. See id. at 587-89. Thereafter, subsequent to petitioner's trial, CALJIC Nos. 5.54 and 5.56 were revised. The revised version of CALJIC No. 5.54 reads as follows:

The right of self-defense is only available to a person who initiated an assault, if [¶] [He] [She] has done all the following: [¶] A [He] [She] has actually tried, in good faith, to refuse to continue fighting; [¶] B [He] [She] has <u>by words or conduct caused [his] [her] opponent to be aware</u>, as a reasonable person, that [he] [she] wants to stop fighting; and [¶] C [He] [She] has <u>by words or conduct caused [his] [her] opponent to be aware</u>, as a reasonable person, that [he] [she] has stopped fighting. [¶] After [he] [she] has done these three things, [he] [she]

United States District Court
For the Northern District of California

1       A challenge to a jury instruction solely as an error under state law does not state a

2   claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62,

3   71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner

4   must show "'the ailing instruction by itself so infected the entire trial that the resulting

5   conviction violates due process.'"  Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147

6   (1973)).  The instruction may not be judged in artificial isolation, but must be considered in

7   the context of the instructions as a whole and the trial record.  Id.

8       In addressing the instant claim, the Court of Appeal recounted petitioner's testimony

9   at trial as follows:

10      [A]fter Goad bit his finger he "hollered 'let go.'"  Then, as he "went down" he
        pushed "hard on her upper chest, trying to get away."  As she was flailing at his
11      face, he "took her one arm, her left arm, with [his] right hand and pinned it to
        the bed hollering for her the whole time [to] 'let go,' 'let go,' 'let go.'"  Next,
12      when she did not let go, he "tried to head butt her a little bit."  Finally, he "put
        the skin of her forehead in [his] teeth" and "just applied more pressure, more
13      pressure, more pressure, until she finally let go."

14  People v. Heidinger,  2004 WL 2181786, at *9.

15      The Court of Appeal noted that under petitioner's version of the events, upon which

16  petitioner relied at trial, petitioner was neither a person who "initiated an assault," see

17  CALJIC 5.54, nor a person who willingly "engaged in mutual combat," see CALJIC 5.56.

18  _____

19      has the right to self-defense if [his] [her] opponent continues to fight.

20  CALJIC No. 5.54 (2004 revision) (emphasis added) (alterations in original).

21      The revised version of CALJIC No. 5.56 reads as follows:

22      The right of self-defense is only available to a person who engages in mutual
        combat: [¶] If [he] [she] has done all the following: [¶] A [He] [She] has
23      actually tried, in good faith, to refuse to continue fighting; [¶] B [He] [She] has
        by words or conduct caused [his] [her] opponent to be aware, as a reasonable
24      person, that [he] [she] wants to stop fighting; and [¶] C [He] [She] has caused
        by words or conduct [his] [her] opponent to be aware, as a reasonable person,
25      that [he] [she] has stopped fighting; and [¶] D [He] [She] has given [his] [her]
        opponent the opportunity to stop fighting.  [¶] After [he] [she] has done these
26      four things, [he] [she] has the right to self-defense if [his] [her] opponent
        continues to fight.
27
    CALJIC No. 5.56 (2008 revision) (emphasis added) (alterations in original).
28

13

United States District Court
For the Northern District of California

Consequently, the Court of Appeal concluded these two self-defense instructions did not apply.  Id.  The Court of Appeal also found, alternatively, that there was no evidence petitioner manifested withdrawal, or informed Goad "either verbally *or by conduct* that he refused to continue to fight, wanted to stop fighting and had stopped fighting."  Id. (emphasis in original).  The Court concluded any error thus was harmless, as there was no factual basis for a claim of self-defense.  Id.

This Court agrees with petitioner that the instructions as given were ambiguous and, consequently, that a "reasonable likelihood" exists that the jury understood them to require a verbal form of withdrawal.  See Estelle, 502 U.S. at 72.  It is not reasonably probable, however, that proper instructions in that regard would have resulted in a more favorable outcome for petitioner.  In order to obtain habeas relief on the basis of an error, petitioner must show that the error was one of constitutional dimension and that it was not harmless. See Brecht v. Abrahamson, 507 U.S. 619, 638-39 (1993).  He would have to show the error had "'a substantial and injurious effect' on the verdict."  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

As noted by the Court of Appeal, neither the prosecution nor the defense presented any evidence to support a finding that petitioner attempted to withdraw, either by words or conduct.  Although petitioner testified that he walked into a different room after Goad let go of him, he testified he did so only after he had bitten Goad on the forehead, i.e., after he had assaulted and inflicted corporal injury on her

Accordingly, petitioner is not entitled to habeas relief on this claim.

> b.   CALJIC Nos. 2.50.02 and 2.50.1

Petitioner claims the trial court erred in instructing the jury pursuant to CALJIC No. 2.50.02 (Evidence of Other Domestic Violence)[7] and CALJIC No. 2.50.1 (Evidence of Other

---

[7] The jury was instructed under CALJIC 2.50.02, in pertinent part, as follows:

Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence other than that charged in the case.

Crimes of Defendant Proved by a Preponderance of the Evidence)[8].  The "other" domestic

> "Domestic violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has had a child or is having or has had a dating or engagement relationship. "Cohabitant" means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship.

> "Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

> If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit another offense involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused. However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses.  If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

> You must not consider this evidence for any other purpose.

(RT 838-39.)

[8] The jury was instructed under CALJIC 2.50.1 as follows:

> Within the meaning of the preceding instruction, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed an act or acts of domestic violence other than that for which he is on trial.

> You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that the defendant committed the other act or acts of domestic violence.

> If you find by a preponderance of the evidence that another act or acts of domestic violence were committed, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any crime charged in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.

United States District Court
For the Northern District of California

violence at issue was a prior incident in which petitioner had choked Goad, the evidence of which came from Goad's testimony at trial. (RT 601-02.) Petitioner argues the instructions allowed the jury to find him guilty by a preponderance of the evidence as opposed to beyond a reasonable doubt, thereby imposing an "illegal standard of proof." (Pet. Attach. A at 18-19.)

An instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 71-72. Here, both of the challenged instructions themselves advised the jury that the standard of proof for the charged crimes was proof beyond a reasonable doubt. Further, the trial court elsewhere instructed the jury on such standard (CT 307) and instructed the jury that the instructions were to be considered as a whole (CT 287). Under such circumstances, there is no reasonable likelihood the jury misapplied the instructions on propensity evidence.[9]

Accordingly, petitioner is not entitled to habeas relief on this claim.

c.      CALJIC No. 5.53

Petitioner claims the trial court erred in refusing to instruct the jury under CALJIC No. 5.53. (Pet. Attach. A at 17.) The instruction states:

CALJIC 5.53 (Self-Defense Not an Excuse After Adversary Disabled)

The right of self-defense ends when there is no longer any apparent danger of further violence on the part of an assailant. Thus where a person is attacked under circumstances which justify the exercise of the right of self-defense, and thereafter the person uses enough force upon [his] [her] attacker as to render the attacker [apparently] incapable of inflicting further injuries, the right to use force in self-defense ends.

CALJIC No. 5.53.

The trial court determined the instruction did not apply to petitioner's case, and defense counsel withdrew his request for the instruction. (RT 811.) Petitioner argues the

_____

(RT 839-40.)

[9] Because the instructions were neither erroneous nor prejudicial, petitioner's related claim of ineffective assistance, premised on counsel's failure to object to the challenged instructions, also fails. See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding trial counsel cannot be deemed ineffective for failing to raise a meritless objection).

instruction did apply because his act of biting Goad until she released his fingers rendered her incapable of inflicting further injury.  (Pet. Attach. A at 17.)

"A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding."  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  "The error must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.  Id.  "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury."  Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).  A defendant is entitled to an instruction on a theory of defense only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant."  United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation and citation omitted).  Due process does not require an instruction be given unless the evidence supports it.  See Hopper v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on lesser included offense required only "when the evidence warrants such an instruction"); see also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (finding insufficient evidence to warrant self-defense instruction).

"The omission of an instruction is 'less likely to be prejudicial than a misstatement of the law,'" Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).  "'[T]he significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.'"  Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting Henderson, 431 U.S. at 156).

Even assuming, arguendo, there was some evidence to support the instruction, the Court finds the omission did not "so infect the entire trial" that petitioner was deprived of a fair trial.  Dunckhurst, 859 F.2d at 114.  To the contrary, the desired instruction described circumstances limiting petitioner's right to use force in self-defense.  Petitioner could not

United States District Court
For the Northern District of California

1   have been prejudiced by the omission of an instruction that would have precluded his

2   reliance on his primary defense.[10]

3        Accordingly, petitioner is not entitled to habeas relief on this claim.

4        d.      Special Instruction

5        Petitioner claims the trial court erred by not instructing the jury "on the relevance [] of

6   [Goad]'s prior conviction for assaulting and inflicting corporal injury on a previous

7   boyfriend[,] because [her] propensity for violence against persons was a key element of

8   petitioner's self-defense claim."  (Pet. Attach. A at 19.)  Goad testified at trial that she had

9   pleaded guilty to spousal abuse after a 1998 altercation with a prior boyfriend.  (RT 600-01.)

10  Petitioner acknowledges the trial court instructed the jury on the effect of Goad's conviction.

11  Specifically, the court instructed the jury under CALJIC No. 2.23.1 as follows:

12  Evidence has been introduced for the purpose of showing that Victoria Goad
    engaged in past criminal conduct amounting to a misdemeanor.  This evidence
13  may be considered by you for the purpose of determining the believability of
    that witness.  The fact that the witness engaged in past criminal conduct
14  amounting to a misdemeanor, if it is established, does not necessarily destroy
    or impair a witness's believability.  It is one of the circumstances that you may
15  take into consideration in weighing the testimony of that witness.

16  (CT 300.)  Petitioner contends the trial court had a duty to issue a more specific instruction

17  sua sponte.  (Pet. Attach. A at 19.)

18       As discussed above, "[a] state trial court's refusal to give an instruction does not alone

19  raise a ground cognizable in a federal habeas corpus proceeding."  Dunckhurst v. Deeds, 859

20  F.2d at 114.  "The error must so infect the entire trial" that the petitioner was deprived of the

21  fair trial guaranteed by the Fourteenth Amendment.  Id.  "Whether a constitutional violation

22  has occurred will depend upon the evidence in the case and the overall instructions given to

23  the jury."  Duckett v. Godinez, 67 F.3d at 745.  Failure to instruct on the theory of the

24  defense violates due process if "'the theory is legally sound and evidence in the case makes it

25

26        [10] Because the omission of the instruction was not prejudicial, petitioner's related
    claim of ineffective assistance of defense counsel, premised on counsel's withdrawal of the
27  requested instruction, likewise fails.  (Pet. Attach. A at 18.)  See Strickland v. Washington,
    466 U.S. 668, 694 (1984) (holding petitioner must establish prejudice resulting from
28  counsel's purportedly deficient performance).

United States District Court
For the Northern District of California

1  applicable.'" <u>Clark v. Brown</u>, 450 F.3d 898, 904-05 (9th Cir. 2006) (quoting <u>Beardslee v.

2  Woodford</u>, 358 F.3d 560, 577 (9th Cir. 2004)).

3        Here, the Court first notes that petitioner nowhere states what special instruction

4  purportedly should have been given.  Consequently, petitioner fails to establish his proposed

5  instruction is "legally sound" and that "evidence in the case makes it applicable."  <u>Clark</u>, 450

6  F.3d at 904-05.[11]

7        Moreover, the trial court instructed the jury as to witness credibility and as to the

8  particular effect of Goad's prior conviction on her credibility.  (CT 294-300.)  The trial court

9  also instructed the jury on self-defense and what is required for a person to reasonably

10  believe he is acting in self-defense.  (CT 330-37.)  To the extent petitioner sought to

11  challenge Goad's credibility or bolster his self-defense claim, such strategy was adequately

12  addressed by these additional jury instructions.

13        Accordingly, petitioner is not entitled to habeas relief on this claim.[12]

14        3.        Denial of Conflict-Free Counsel

15        Petitioner claims he was "denied conflict-free counsel" because his appointed trial

16  counsel, Scott Erdbacher ("Erdbacher"), "was the judge's first cousin."  (Pet. Attach. A at

17  24.)  The Court of Appeal summarized the background of this claim as follows:

18        Initially, [petitioner] retained attorney Daniel Mayfield to represent him.  On
       October 22, 2002, counsel moved to withdraw on several grounds, including a
19        possible conflict of interest, [petitioner's] lack of funds and the belief that
       [petitioner] wished to proceed in pro per.  Mayfield's motion to withdraw was
20        granted.

21        Subsequently, the trial court appointed the public defender to represent

22

23        [11]  Moreover, although in CALJIC, the second sentence of CALJIC No. 2.23.1 reads:
   "This evidence may be considered by you <u>only</u> for the purpose of determining the
24  believability of that witness," <u>see</u> CALJIC No. 2.23.1 (emphasis added), the instruction, as
   read to the jury, omitted the word "only" (RT 837).  Further, the word "only" was crossed
25  out in the written instruction provided to the jury.  (<u>See</u> CT 300.)  Consequently, to the extent
   petitioner sought a special instruction omitting the word "only," he received such instruction.

26        [12] Petitioner's related claim of ineffective assistance of defense counsel, premised on
27  counsel's failure to request the special instruction, also fails.  (Pet. Attach. A at 21.)  As
   discussed above, petitioner identifies no special instruction that counsel purportedly should
   have requested.  Petitioner thus fails to show ineffectiveness on the part of defense counsel
28  and further fails to demonstrate prejudice.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88, 694.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[petitioner]. However, on December 17, 2002, the public defender declared a conflict. On December 18, 2002, the court appointed Scott Erdbacher to replace the public defender. Judge Scott disclosed that Erdbacher was his first cousin.

After appointing Erdbacher, Judge Scott addressed the court: "This is actually a case where you need to outline your relationship with the Court. He's [Erdbacher] my first cousin. I don't know if that makes any difference. To me it hasn't made any difference in the last 20 years. You never know." There was no response from [petitioner].

People v. Heidinger, 2004 WL 2181786, at *5-6.

A criminal defendant is entitled under the Sixth Amendment to an effective attorney who can represent him competently and without conflicting interests. Garcia v. Bunnell, 33 F.3d 1193, 1195 (9th Cir. 1994). In order to establish a violation of the Sixth Amendment, a petitioner "who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). A petitioner must show: (1) "his attorney actively represented conflicting interests," and (2) "the representation actually affected the attorney's performance." Paradis v. Arave, 130 F.3d 385, 391 (9th Cir. 1997).

Petitioner's claim fails at the first step as he fails to show counsel "actively represented conflicting interests." Erdbacher was petitioner's attorney, he represented no other party or witness, and petitioner fails to establish how Erdbacher's relation to the trial judge constituted representation of another interest, let alone a "conflicting" interest.

Further, petitioner fails to satisfy the second requirement, as he does not demonstrate any adverse effect on counsel's performance due to such purported conflict.[13] To the contrary, as found by the appellate court:

[C]ounsel sought to and did impeach the victim with her prior misdemeanor conviction for domestic abuse. Defense counsel objected to impeachment of [petitioner] with his prior convictions and sought to bifurcate the trial on the priors. Moreover, defense counsel made sure that the court struck count three. In addition, the record reveals that defense counsel vigorously cross-examined prosecution witnesses. More importantly, he was able to get witnesses to admit that they did not see a gun in [petitioner's] hands. Defense counsel tried to

---

[13] Although petitioner alleges numerous errors by counsel, which will be addressed in the next section, he fails to demonstrate that any purported deficiencies were attributable to counsel's relationship with the trial judge.

impeach the credibility of the prosecution witnesses by questioning why Goad and Green did not go immediately to the hospital.  Further, he pointed out that, despite Green and Goad's testimony that Goad's hair was coming out after the attack, there was nothing to indicate any hair loss in the medical records or the police reports.  Finally, defense counsel convinced the jury that no firearm was used.

People v. Heidinger, 2004 WL 2181786, at *7.  Upon review of the record, the Court agrees that counsel provided vigorous representation, and there is no evidence of "adverse effect."

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.    Ineffective Assistance of Trial Counsel

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong."  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).  Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011).  The general rule of Strickland, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably

applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." <u>Cheney v. Washington</u>, 614 F.3d 987, 995 (9th Cir. 2010) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  When section 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 788 (2011).

Petitioner claims his trial counsel provided ineffective assistance by failing to: (1) present expert medical evidence as to petitioner's asserted disability; (2) conduct sufficient pre-trial investigation; (3) introduce evidence about Goad's purported use of methamphetamines; and (4) challenge petitioner's sentence.  The Court addresses each such claim in turn.

a.   <u>Failure to Present Expert Medical Evidence</u>

Petitioner claims counsel "failed to investigate and present medical expert evidence corroborating petitioner's testimony that he was physically incapable of performing the acts initiating the confrontation as claimed by the complaining witness." (Pet. Attach. A at 31 & Attach. C at 6-16.)  In support thereof, petitioner submits evidence that, following his conviction, his appellate counsel spoke with Dr. Martin Trieb ("Dr. Trieb"), a physician who treated petitioner in 2000 for a right shoulder injury and for arthritis in the right shoulder. (Pet. Attach. C-1, Ex. A at ¶ 5 & Ex. B at ¶¶ 2-3.)  In connection with petitioner's October 26, 2004 state petition for a writ of habeas corpus, Dr. Trieb submitted a declaration (Pet. Attach. C-1, Ex. B) in which he opined that petitioner had "limited [] range of motion" in his right arm, which was permanent (<u>id.</u> at ¶ 3);  Dr. Trieb elaborated that petitioner could: (1) "raise his right arm in front of his body, in a plane perpendicular to a line drawn through both shoulders, no more than ninety degrees" and (2) "raise [his right arm] to his right side, in a plane parallel with a line drawn through both shoulders, no more than fifty degrees" (<u>id.</u>).

Thereafter, petitioner himself wrote to Dr. Trieb, requesting he be "more explicit in the exact loss of function." (Pet. Attach. A at 31.)  In response, Dr. Trieb sent petitioner a

22

United States District Court<br>For the Northern District of California

letter, dated, February 10, 2005, expanding his description of petitioner's right arm mobility, as follows:

> Your final range of motion on August 9, 2000 showed combined glenohumeral and sacpulothoracic motion (entire shoulder motion) limited to 90 degrees of forward flexion and 80 degrees of abduction. Of that range of motion, 50 percent was actually in the scapulothoracic region rather than in the shoulder joint proper. . . . This markedly limited range of motion and associated weakness would make it very unlikely you could deliver any forceful blow with your right arm. This is not to say that you could not strike a person with your fist, but there would be very little force behind it. It would be impossible for you to use your arm above the horizontal (above the shoulder level) for any function.

(Pet. Ex. Fed. B at 2.)

Petitioner's evidence is insufficient to establish an ineffectiveness claim. First, Dr. Trieb's letter only relates to what he observed in August 2000. He expresses no opinion as to whether petitioner had the mobility to strike a person with force at the time of the offense here at issue, which occurred almost two years later in May 2002.

Further, Dr. Trieb's statements do not refute the prosecution's case. Goad did not testify that petitioner solely struck her with his right fist or that he lifted his arm above the shoulder level in order to strike her. To the contrary, she testified she was in a sleeping position when she awoke to petitioner punching her. Specifically, Goad testified she was "laying on the bed" when she awoke to petitioner "hitting [her] head." (RT 565-66.) Goad also testified that during the assault, up to the point petitioner purportedly went to retrieve a gun, she remained "on the bed . . . on [her] knees" or "sitting on the bed." (RT 569, 571.)

Moreover, counsel may have reasonably concluded Dr. Trieb's testimony would not assist the defense case, given that Goad's injuries were demonstrably real, and that petitioner even admitted to causing some of them during the struggle. Specifically, the hospital staff observed that Goad had bruising, swelling, a bite mark and abrasion, see Heidinger, 2004 WL 2181786 at *3, and petitioner testified that after Goad bit his fingers, he started "pushing hard on her upper chest, trying to get away" (RT 764), that he "took her one arm, her left arm, with [his] right hand and pinned it to the bed" (id.), and then "put the skin of her forehead in [his] teeth [and] applied more pressure . . . until she finally let go" (id.).

Finally, the evidence of petitioner's shoulder injury was presented to the jury through petitioner's own testimony.  (RT 767.)  Specifically, petitioner testified that he had been "permanently disabled in the right shoulder from August 19th, 1999"; that the injury "prevent[ed] [him] from mobility of the right arm"; and that he is "physically unable to throw a punch with [his] right arm."  (Id.)  Additionally, petitioner was permitted to demonstrate his range of right arm motion to the jury by showing how far he could lift it.  (RT 768.)

Given the above-described circumstances, it cannot be said that counsel's decision did not "reflect the skill and judgment one would expect of a reasonably competent attorney." Denham v. Deeds, 954 F.2d 1501, 1505 (9th Cir. 1992).  See also Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.").  Put another way, the state court was not unreasonable in denying the claim, as counsel could have made a reasonable tactical decision to forego calling Dr. Trieb.[14]

Accordingly, petitioner is not entitled to habeas relief on this claim.

b.    Failure to Investigate and Call Witnesses

Petitioner claims counsel failed to conduct a proper pre-trial investigation.  (Pet. Attach. A at 33-38.)  According to petitioner, such investigation would have uncovered various witnesses who would have testified to petitioner's good character as well as to Goad's purported prior violence against petitioner, Goad's purported filing of false police reports, and Goad's purported drug use.  (Pet. Attach. A at 35-38 & Exs. H-I.)  Petitioner's allegations are unavailing.

At the outset, the Court notes petitioner has offered only his own conclusory statements and fails to provide a factual showing that his trial lawyer in fact failed to investigate the purported witnesses.  Petitioner thus fails to show ineffectiveness on the part of defense counsel.  See United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984)

---

[14] Because petitioner fails to show trial counsel's performance was deficient, the Court does not reach the prejudice prong of the Strickland test.  See Siripongs, 133 F.3d at 737.

(holding petitioner must make sufficient factual showing to substantiate ineffective assistance of counsel claim).

Moreover, to succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner. See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003). A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance. See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner only provided his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony. Id. at 486-87; cf. Alcala, 334 F.3d at 872 & n.3 (distinguishing, inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted interviews reflecting testimony missing witnesses would have provided). As with the petitioner in Dows, petitioner here submits no more than his own statements in his petition; he provides no affidavit from any of his purported "defense witnesses," or any other evidence showing the testimony they would have given. Nor does petitioner provide any evidence demonstrating any such witness was available to testify at trial.[15]

---

[15] Petitioner does point to a declaration, given by Daniel Mayfield ("Mayfield"), the attorney petitioner initially retained to represent him at trial (CT 91-95 (Mayfield Decl.)), and submitted in support of said attorney's motion to withdraw as counsel (id. ¶ 3). In the declaration, Mayfield disputes the contents of a police report prepared on August 8, 2002, describing, inter alia, an interview of petitioner at which Mayfield was present. (Id. ¶¶ 8, 10.) The police report states petitioner had indicated he and Goad were frequent users of methamphetamine, whereas Mayfield states in his declaration that at the interview

United States District Court
For the Northern District of California

1    Accordingly, petitioner is not entitled to habeas relief on this claim.

2              c.    Failure to Present Expert Evidence Relating to Goad's Drug Use

3    Petitioner claims counsel should have "called a doctor specializing in

4 methamphetamine abuse" to show Goad was the "aggressor" in the assault.  (Pet. Attach. A

5 at 38-39.)  Again, petitioner has not offered any evidence showing any such proposed doctor

6 would have provided favorable testimony.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th

7 Cir. 1997) ("Speculation about what an expert could have said is not enough to establish

8 prejudice").

9    Accordingly, petitioner is not entitled to habeas relief on this claim.

10              d.    Failure to Object to Sentence

11    Petitioner claims counsel was ineffective because he "did not object to the 25 years to

12 life sentence imposed in this case."  (Pet. Attach. A at 39.)  A review of the record shows

13 counsel filed a motion to strike petitioner's prior convictions.  (CT 241-46.)  In such motion,

14 counsel highlighted petitioner's education, successful completion of parole, and expression

15 of remorse.  (Id.)  Petitioner does not identify what further objection counsel should have

16 made, or how any such objection would have prevented the sentencing court's imposition of

17 the 25-years-to-life sentence under California's Three Strikes Law.  See Cal. Penal Code §

18 1170.12(c)(2).

19    Further, the Supreme Court has not determined the standard by which a defense

20 attorney's performance in non-capital sentencing proceedings should be judged.  Cooper-

21 Smith v. Palmateer, 397 F.3d 1236, 1244 (9th Cir. 2005).  Strickland declined to "'consider

22 the role of counsel in an ordinary sentencing, which . . . may require a different approach to

23 ──────────────

24 "[petitioner] never said that he used methamphetamine 'frequently' or at all with Ms. Goad."
(Id. ¶¶ 11-12.)  Petitioner argues defense counsel should have called Mayfield as a defense
25 witness to contradict the police report. (Pet. Attach. A at 37-38.)  A review of the trial record,
however, shows the prosecution did not offer the police report or elicit any testimony
26 regarding its content at trial.  Nor could Mayfield's testimony have been used to impeach
Goad's testimony on the subject of drugs, as there is nothing in the record or petition to
27 suggest Mayfield had any personal knowledge as to petitioner's methamphetamine use.
Consequently, petitioner fails to show defense counsel's decision not to call Mayfield
28 constituted deficient performance, and further fails to demonstrate he was prejudiced thereby.

the definition of constitutionally effective assistance,'" and no later Supreme Court decision has done so.  Id. (quoting Strickland, 466 U.S. at 686).  Consequently, there is no clearly established Supreme Court precedent governing ineffective assistance of counsel claims in the context of non-capital sentencing.  See Davis v. Grigas, 443 F.3d 1155, 1158-59 (9th Cir. 2006); Cooper-Smith, 397 F.3d at 1244-45.

Accordingly, petitioner is not entitled to habeas relief on this claim.

5.   Violation of Right to Jury Trial

Petitioner claims, with regard to his conviction for the offense of misdemeanor assault, "[t]he reviewing court engaged in pure speculation in its view of what a reasonable jury would have done, which violates petitioner's rights to a fair trial, due process, jury trial, 5th, 6th, 8th, and 14th Amendments."  (Pet. Attach A at 42.)  The Court of Appeal affirmed petitioner's conviction, reasoning as follows:

> [Petitioner] contends that the trial court erred by failing to strike the misdemeanor assault conviction in count one.
>
> . . . [Petitioner] maintains that the assault conviction must be stricken because assault is necessarily included in the offense of corporal injury on a cohabitant.
>
> The People argue that the trial court was not required to strike the assault conviction because [petitioner's] acts constituted several assaults.  As such, the two counts did not depend on the same act.  The People contend that [petitioner] got the gun after he hit Goad in the head, choked her and bit her. When she tried to leave the motor home, he pulled her by the hair. Accordingly, while the jury did not find beyond a reasonable doubt that [petitioner] had a firearm, it could have concluded that he assaulted Goad by pulling her hair to prevent her from leaving after inflicting the corporal injury.
>
> Penal Code section 954 sets forth the general rule that defendants may be charged with and convicted of multiple offenses based on a single act or an indivisible course of conduct.  It provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission or different statements of the same offense . . .The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged. . . ."
>
> One exception to this rule is "that multiple convictions may *not* be based on necessarily included offenses.  [Citations.]"  (*People v. Pearson* (1986) 42 Cal.3d 351, 355 (*Pearson*).)
>
> In *Pearson*, the defendant committed an act of sodomy on each of two children. For each act, he was convicted of two offenses: sodomy with a child under 14 and lewd conduct.  The trial [court] imposed sentence for the lewd conduct

convictions but stayed sentence on the sodomy conviction so that the defendant would not be punished twice for the same act. (*Id.* at p. 354.)

Ultimately, the Supreme Court affirmed the conviction because "the offense of lewd conduct is not a lesser included offense of statutory sodomy." (*Id.* at p. 355.)

[Petitioner] argues correctly that assault (Pen.Code, § 240) is necessarily included in the offense of corporal injury on a cohabitant. (Pen.Code, § 273.5.) (*People v. Gutierrez* (1985) 171 Cal.App.3d 944, 952.) Thus, he contends that he cannot be convicted of both inflicting corporal injury on a cohabitant and simple assault.

We would agree with [petitioner] if he had been found guilty of the lesser-included offense of assault on the count two charge of inflicting corporal injury on a cohabitant, as well as the greater offense. The rule of *Pearson*, however, is that a defendant may not be convicted of a greater and lesser offense for the same act. (*People v. Pearson*, supra, 42 Cal.3d at p. 355.) Here, Goad testified to two distinctly different acts: the hitting and biting by [petitioner] followed by a break where [petitioner] goes to the front of the RV and comes back with a gun, then the hair pulling. The jury could have found that the latter was a simple assault that did not result in corporal injury. Accordingly, we conclude that [petitioner's] conviction for simple assault can stand.

People v. Heidinger, 2004 WL 2181786, at *9-10.

Petitioner's claim that the Court of Appeal engaged in "erroneous factfinding" lacks merit. (Pet. Attach. A at 42.) The Court of Appeal found petitioner could be convicted of two separate acts, misdemeanor assault and corporal injury on a cohabitant, where the former was not necessarily a lesser-included offense of the latter. This Court will not disturb the California Court of Appeal's interpretation of California law. See Estelle, 502 U.S. at 67-68 (holding federal writ not available for alleged error in interpretation or application of state law).

Accordingly, petitioner is not entitled to habeas relief on this claim.

6.      Prosecutorial Misconduct

Petitioner claims the prosecutor engaged in misconduct by: (1) lying to the jury about the existence of Dr. Trieb; (2) misrepresenting the attack; (3) suppressing evidence; (4) coaching the complaining witness; (5) misleading the defense about evidence the prosecution intended to present; (6) eliciting evidence in violation of a court ruling; (7) presenting false testimony that Goad had been harassed by petitioner in another county;

and (8) presenting false testimony that Goad had been living with petitioner.  The Court addresses each such claim in turn.

a.   Dr. Trieb

Petitioner claims "the prosecutor lied to the jury about the existence of Dr. Martin Trieb."  (Pet. Attach. A at 44-46.)  Specifically, petitioner refers to the following portion of the prosecutor's closing argument:

> [Petitioner] talks about the inability to use his right arm, the degree of injuries being severe, and he refers to several doctors.  But all you have is [petitioner's] testimony.  That's all.  I put it to you those–those doctors don't exist.  There is not someone who can come in and say he can't raise his right arm, because they would be here if they did exist.

(RT 825-26.)

Prosecutorial misconduct is cognizable in federal habeas corpus.  "[T]he appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation and citation omitted).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) (noting, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation and citation omitted).

A "prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased to call attention to [the] defendant's own failure to testify." United States v. Castillo, 866 F.2d 1071, 1083 (9th Cir. 1988) (internal quotation and citation

United States District Court
For the Northern District of California

1   omitted).  Here, the prosecutor did not comment on any failure of petitioner to testify,[16] but,

2   rather, on petitioner's failure to present certain evidence and witnesses regarding his

3   purported shoulder injury.  In particular, the prosecutor made reference to the type of witness

4   that could have been presented, specifically a medical doctor.  The defense did not call Dr.

5   Trieb, or any other doctor, to substantiate his claimed shoulder injury.  Petitioner does not

6   show it was "fundamentally unfair" for the prosecutor to remark on such failure.  See United

7   States v. Mende, 43 F.3d 1298, 1301 (9th Cir. 1995) (holding prosecutor's comments not

8   improper where they simply reminded jury that defense had failed to present certain

9   evidence).[17]

10          Accordingly, petitioner is not entitled to habeas relief on this claim.

11                  b.      The Attack

12          Petitioner claims the prosecutor "deliberately confused the jury about the evidence of

13   who bit who first."  (Pet. Attach. A at 46.)  This claim has no support in the record.  During

14   direct examination, Goad testified she bit petitioner on the finger, and that he then bit her.

15   (RT 570-71.)  On cross-examination, the following exchange took place:

16          [Defense Counsel]: Did you bite him first?

17          [Goad]: No. I did not.

18          [Defense Counsel]: He bit you on the forehead before you bit him; is that the
            way it happened?
19
            [Goad]: Yes.  Well, I think I bit his finger and then he bit me on the forehead.
20
            [Defense Counsel]: So you bit him first?
21
            [Goad]: Yeah.
22
23   (RT 598.)  In her closing argument, the prosecutor stated:

24          And if you note when [Goad] was on the stand talking in cross-examination to
            [defense counsel], when he recited the sequence of the bites in reverse of what
            she had said when she testified on direct he–she initially agreed with him and
25          then listened to him and said no.  No.  It happened the other way

26          _____

27          [16]  Indeed, petitioner did testify in his own defense.

28          [17] Petitioner does not allege, for example, the prosecutor was aware of Dr. Trieb's
        existence but nonetheless suggested to the jury that such individual did not exist.

United States District Court
For the Northern District of California

(RT 823-24.)  Petitioner points to nothing in the record showing the prosecutor attempted to mislead the jury about the sequence of biting.  If anything, the prosecutor's closing argument highlighted the fact that Goad bit petitioner first.

Accordingly, petitioner is not entitled to habeas relief on this claim.

c.   Brady Claim

Petitioner claims "the prosecution never gave petitioner requested discovery on the 9-1-1 call, the sheriff's deputy(ies) who were first responders, their/his/her report, notes, etc., nor a name or names in order for petitioner to make contact."  (Pet. Attach. A at 48.)

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  The duty to disclose such evidence applies even when there has been no request by the accused.  United States v. Agurs, 427 U.S. 97, 107 (1976).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682 (1985).

"There are three components of a true Brady violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  "[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Id. at 281.

Petitioner's claim fails at the first step, as petitioner fails to establish the emergency-response evidence was exculpatory or impeaching.  See Phillips v. Woodford, 267 F.3d 966, 987 (9th Cir. 2001) (holding district court did not err in characterizing Brady claims as "mere suppositions" where petitioner failed to show desired evidence was exculpatory).

Further, petitioner fails to show the prosecutor suppressed the requested evidence. While petitioner points out that his first attorney, Mayfield, wrote to the trial court in October 2002 regarding outstanding discovery issues (CT 161-65), there is no showing petitioner's counsel ultimately lacked access to the requested evidence. To the contrary, petitioner's subsequent counsel later informed appellate counsel that he "knew who the officer was." (Pet. Ex. Fed. K at 3.)

Finally, petitioner fails to establish prejudice. Petitioner makes no argument showing "a reasonable probability that the subject evidence would have produced a different verdict." Strickler, 527 U.S. at 281.

Accordingly, petitioner is not entitled to habeas relief on this claim.

d.     Coaching of Witness

Petitioner claims the prosecutor "illegally prepared [Goad] to testify . . . by instructing the witness to read the police reports." (Pet. Attach. A at 49.)

i.     *Background*

During Goad's cross-examination, the following exchange took place:

[Defense counsel]: Did you–have you read any of the police reports

in regards to this incident?

[Goad]: Yes, I have.

Q: When did you do that?

A: When is the first time I did that? Is that your question?

Q: When?

A: The first time would be the first hearing.

Q: Okay. Do you have a copy of the reports?

A: No, not offhand I don't.

Q: Did you read the reports before you testified today?

A: Yes, I did.

Q: And that was because you were having trouble remembering what

happened?

United States District Court

For the Northern District of California

1    A: No. Because I was asked to.

2    Q: Who asked you to do?

3    A: Angela.

4    Q: The district attorney?

5    A: Uh-huh.

6    Q: Is that yes?

7    A: Yes, it is.

8  (RT 590-91.)

9    Later, on re-direct examination, Goad was questioned again on this issue:

10   [Prosecutor]: Now, this is the second time you've testified in this

11   matter, isn't it?

12   [Goad]: Yes.

13   Q: You testified once before, last year in August, didn't you?

14   A: Yes.

15   Q: Okay. Did–when you read the police report did you try to

16   memorize it?

17   A: No.

18   Q: Okay. When you talk about what happened to you on June 2nd

19   and even in January of last year are you doing that from your memory?

20   Is that a yes?

21   A: Yes.

22   Q: Okay.

23

24  (RT 602-03.)

25   Immediately thereafter, defense counsel returned to the issue:

26   [Defense counsel]: Why did you read the police report before you

27   testified today?

28   [Goad]: Just going over it. Just glance through it. I really didn't read

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    everything.

2    [Defense counsel]: All right. That's all.

3    (RT 603.)

4       ii. *Analysis*

5      A prosecutor violates due process by obtaining a conviction through evidence known

6    to the prosecution to be false or misleading.  <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).  To

7    succeed on a false evidence claim, a petitioner must show: "(1) the testimony (or evidence)

8    was actually false, (2) the prosecution knew or should have known that the testimony was

9    actually false, and (3) . . . the false testimony was material."  <u>Hayes v. Brown</u>, 399 F.3d 972,

10   984 (9th Cir. 2005).

11     Petitioner fails to make the necessary showing.  While Goad's testimony was material

12   to the case, thus meeting the third Hayes requirement, petitioner fails to submit any evidence

13   that Goad's testimony was actually false or that the prosecutor knew or should have known

14   the testimony was false–the first and second <u>Hayes</u> requirements.  Defense counsel

15   specifically explored the possibility that Goad relied on the police reports for her testimony,

16   and Goad made clear that she had testified based on her memory, not the police reports.  Any

17   possible inference of improper "coaching" was dispelled by Goad's testimony.  <u>See</u> <u>United</u>

18   <u>States v. Sayakhom</u>, 186 F.3d 928, 945 (9th Cir. 1999) ("Cross-examination and argument

19   are the primary tools for addressing improper witness coaching.").

20     Accordingly, petitioner is not entitled to habeas relief on this claim.

21      e. <u>Misleading the Defense</u>

22     Petitioner claims "[t]he prosecutor deliberately misled the defense about evidence the

23   State intended to introduce regarding its theory of petitioner's guilt."  (Pet. Attach. A at 49.)

24   Specifically, he claims the prosecutor stated petitioner "need not prepare nor present a

25   defense to" allegations that petitioner used methamphetamine.  (<u>Id.</u> at 40.)

26      i. *Background*

27     On October 24, 2002, the trial court held a hearing on Mayfield's motion to withdraw

28   as petitioner's counsel.  (RT 10/24/02.)  In addition to his concern that he had not been paid

United States District Court

For the Northern District of California

(CT 124), Mayfield was concerned he might become a witness in the case because he had attended the above-referenced meeting between petitioner and police in which petitioner, according to the police report, had discussed methamphetamine use (CT 121-23).  At the hearing on the motion to withdraw, the trial judge asked Mayfield how his presence at the interview would come up at the trial or how his testimony would be needed.  (RT (10/24/02) at 3.)  The following exchange then took place:

> Mr. Mayfield: Okay.  Here's exactly how it would come up: That a defense in this case would include the fact that the complaining witness is a methamphetamine user.  The evidence would come in as to the complaining witness'[s] methamphetamine use.  She would probably[–] perhaps[–]testify that my client was a methamphetamine user.  They–my client denies that; that without him taking the stand–

> The Court: What relevance would her testimony about your client being a methamphetamine user have to do with this case?  How would it ever come in?

> Mr. Mayfield: Well, your Honor, obviously I would ask that it not come in. I think the relevance–

> The Court: Okay.  What would your response be to that?

> [Prosecutor]: I have–this is not a meth case. I don't–

> The Court: I don't see it coming in.  Okay.  So your next point is the conflict.

> Mr. Mayfield: Okay.  I'm very glad that that's not something that's going to come in.  Is the opposite going to come in?  Is the use of methamphetamine by the complaining witness going to come in?

> The Court: Well, that's a whole different issue and it doesn't have anything to do with your client's case.  I just don't see your client's use or nonuse as being relevant here, unless he was using on an occasion where he was giving a statement to somebody which might impair his ability to remember something.  I can't see the issue even coming up.  And so far, she's saying that's not an issue.

> Mr. Mayfield: Okay.

(RT (10/24/02) 3-4.)  At trial, the prosecutor asked Goad the following questions relating to petitioner's drug use:

> [Prosecutor]: Now, when you lived with [petitioner] you indicated you had a sexual relationship with him.  Did you also engage in the use of any drugs?

1     [Goad]: Yes.

2     [Prosecutor]: What type of drugs?

3     [Goad]: Amphetamines.

4     [Prosecutor]: Both of you or just you?

5     [Goad]: Both.

6     [Prosecutor]: Okay.  And where did you get those drugs?

7     [Goad]: From him.

8   (RT 560.)

9                       *ii.     Analysis*

10        Petitioner's claim lacks merit.  First, there is no clearly established Supreme Court

11   precedent holding a defendant must be given notice of inculpatory evidence the prosecution

12   plans to introduce at trial.  See Gray v. Netherland, 518 U.S. 152, 168-70 (1996).[18]

13        Moreover, petitioner has not shown that, had he known about Goad's testimony as to

14   his drug use, there is a reasonable probability the result of the proceeding would have been

15   different.  See Brecht, 507 U.S. at 623.   Defense counsel had the opportunity to cross-

16   examine Goad about the allegations.  Further, petitioner had the opportunity to directly deny

17   the allegations through his own testimony.  Indeed, he did so.  (See RT 776-77.)

18        Accordingly, petitioner is not entitled to habeas relief on this claim.

19            f.    Violation of Court Ruling

20        Petitioner claims "[t]he prosecutor elicited for and received inadmissible evidence in

21   violation of a court ruling."  (Pet. Attach. A at 51.)  Specifically, petitioner refers to evidence

22   of his prior convictions.  (Id.)[19]  A review of the record does not support petitioner's assertion

23   that the trial court entered a ruling precluding admission of petitioner's prior convictions.  To

24   the contrary, prior to trial, the trial court specifically ruled evidence of the prior convictions

25

26        [18] Further, contrary to petitioner's assertion, the prosecution made no affirmative
     representation to either petitioner or the court that such evidence would not be used.  (See RT
27   (10/24/02) 4:9-10.)

28        [19] Petitioner's five prior felony convictions arose from his 1983 rape of a juvenile.
     (See RT 769-70.)  Petitioner was convicted of the offenses in 1984.  (See CT 277-85.)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

was admissible, stating as follows:

> With respect to the offenses that occurred in 1984, the convictions occurred in 1984, those are felonies that go to the heart of credibility. They are clearly probative of credibility. They don't lose that probative nature with the passage of time. . . . Clearly those are substantial moral turpitude offenses that just don't pass–or the relevance doesn't pass with that amount of time. . . . If he was to take the stand the prior felonies would come in.

(RT 508-09.) When petitioner testified, the prosecutor cross-examined him as to his five prior felony convictions. (RT 769-70.)

Nothing in the record supports petitioner's assertion that the trial court had excluded that evidence. Indeed, under state law, petitioner's prior convictions fell within the scope of relevant cross-examination for at least two reasons. First, under California Evidence Code section 788, prior felony convictions are admissible as relevant to a witness's credibility. By testifying, petitioner placed his credibility at issue. Second, under California Evidence Code section 1103(b), petitioner' prior offenses were relevant to prove he had a propensity for violence, and that he acted in conformity with such character trait in committing the offenses charged at his trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.[20]

       g.    <u>Perjured Testimony Regarding Harassment</u>

Petitioner claims the prosecutor "illegally prejudiced the jury against petitioner" by introducing testimony "known to be false." (Pet. Attach. A at 51.) Specifically, petitioner refers to the following portion of Goad's testimony:

> [Prosecutor]: Now–now, after the June 2nd [assault] you didn't initiate any
>
> attempt to talk to [petitioner] at all, did you?
>
> [Goad]: No.
>
> [Prosecutor]: In fact, did you move from the area?

---

[20] Within this claim, petitioner, citing <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976), also asserts the prosecutor committed "<u>Doyle</u> violations." (<u>See</u> Pet. Attach. A at 51, 53.) In <u>Doyle</u>, the Supreme Court held the government may not use a defendant's silence "at the time of arrest and after receiving <u>Miranda</u> warnings" to impeach the defendant's exculpatory testimony at trial. <u>Doyle</u>, 426 U.S. at 619. Petitioner identifies no comments by the prosecutor regarding petitioner's silence. Accordingly, to the extent petitioner seeks to assert a <u>Doyle</u> claim, such claim fails.

United States District Court
For the Northern District of California

[Goad]: Yes.

[Prosecutor]: Okay, And the location where you moved, did there come a time when you saw [petitioner]?

[Goad]: Yes.

[Prosecutor]: Okay.  Do you know about when that was?

[Goad]: Oh, like several months afterwards.

[Prosecutor]: after the June 2nd incident?

[Goad]: Yeah.

[Prosecutor]: And how was it you saw [petitioner]?

[Defense Counsel]: I object to the relevance.

[Trial Court]: Overruled.

[Prosecutor]: How is it?  Where were you?

[Goad]: I was in my vehicle.

[Prosecutor]: Were you in another county?

[Goad]: Yes.

[Prosecutor]: What county were you in?

[Goad]: That was Merced County?

[Prosecutor]: Is that where you were living?

[Goad]: Yes.

[Prosecutor]: And you were in your vehicle.

[Goad]: Yes.

[Prosecutor]: And where did you see [petitioner]?

[Goad]: He was right in front of us.

[Prosecutor]: On the road?

[Goad]: Yeah.  On the road.

[Prosecutor]: Were you driving with someone else?

[Goad]: Yeah.  I was driving with someone else.

[Prosecutor]: Okay.  And did–did you see him for a period of time on the road

1   in front of you?

2   [Goad]: We actually followed him to make sure it was him and it was him.

3   [Prosecutor]: And then what happened?

4   [Goad]: And we left and we contacted the police department for Merced

5   County.

6   [Prosecutor]: Why did you contact the police department?

7   [Goad]: Because I was scared.  He had been seen before.

8   [Prosecutor]: In Merced?

9   [Goad]: Yeah.  Around my mother's house.

10  [Prosecutor]: Okay.  And your mother is Cheryl Goad?

11  [Goad]: Yes.

12  [Prosecutor]: Were you living with your mother at that point?

13  [Goad]: Yes.

14  (RT 798-99.)

15          As discussed above, to succeed on a false evidence claim, a petitioner must show:

16  "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have

17  known that the testimony was actually false, and (3) . . . the false testimony was material."

18  Hayes, 399 F.3d at 984.  Petitioner fails to satisfy any of these requirements.  First, petitioner

19  does not establish a factual basis for his assertion that Goad's testimony was false; he merely

20  asserts it was false.  Second petitioner sets out no factual basis for his assertion that the

21  prosecutor knowingly presented perjured testimony.  Lastly, petitioner fails to show the

22  "false testimony" was material.

23          Accordingly, petitioner is not entitled to habeas relief on this claim.

24                  h.      Perjured Testimony Regarding Goad's Residence

25          Petitioner claims "[t]he prosecutor presented evidence known to be false when she

26  solicited for and received testimony from the complaining witness that petitioner had been

27  'living with' [the] same witness in San Benito County, then in Monterey County."  (Pet.

28  Attach. A at 52.)  Specifically, Goad testified she and petitioner were living together in San

United States District Court
For the Northern District of California

Benito County from December 2001 or January 2002 up to May 2002, at which time they drove petitioner's RV to Monterey County. (RT 558-59.) Goad further testified she and petitioner thereafter lived together in the RV and in a motel in Monterey County up to the time of the assault in June 2002. (RT 559-62.)

Petitioner again fails to satisfy the <u>Hayes</u> test. First, the only support he provides for his assertion that the testimony was false is the police report regarding the June 2002 assault, which listed a San Juan Bautista address for Goad. (<u>See</u> Pet. Ex. Fed. D.)[21] The report, however, is not sufficient to show Goad perjured herself, as the source of the address is not stated therein. For example, the officer taking the report could have copied the address from an outdated source, such as Goad's driver's license. Alternatively, Goad may have provided her permanent address, as she and petitioner thereafter had been living in an RV and motels. Further, while petitioner now asserts he was not living with Goad, such assertion is undermined by his own trial testimony, in which he stated that he and Goad lived together "on and off." (RT 756.) Consequently, petitioner fails to show the testimony was "actually false." <u>See</u> <u>Hayes</u>, 394 F.3d at 984.

Further, petitioner fails to satisfy the second <u>Hayes</u> requirement, that the prosecution knew or should have known the testimony was false. He contends the prosecutor knew the evidence was false because she decided to drop the charges for petitioner's failure to file a change of address, under California's sex offender registration laws. (Pet. Attach. A at 52.) Petitioner fails to establish, however, how any such charging decision related to his actual residence, let alone how it related to whether or not he was living with Goad. Indeed, petitioner admitted he and Goad had moved together to Monterey County in May 2002. (RT 756.) Lastly, with respect to the address, the difference between Goad's testimony and the police report was one month, a distinction petitioner fails to show was in any manner material to his defense.

---

[21] San Juan Bautista is located in San Benito County.

1    Accordingly, petitioner is not entitled to habeas relief on this claim.[22]

2        7.        Apprendi Error

3    Petitioner claims his sentence was imposed "in excess of the maximum allowable

4    sentence on the basis of findings made by the judge rather than by the jury." (Pet. Attach. A

5    at 54.)  The claim fails because the trial court enhanced petitioner's sentence not based on

6    aggravating facts as determined by the judge, but rather based on prior convictions.

7    In Cunningham v. California, 549 U.S. 270, 288-89 (2007), the Supreme Court held

8    California's determinate sentencing law, which authorized a judge, rather than a jury, to find

9    facts exposing a defendant to an enhanced sentence, violated a defendant's right to trial by

10   jury.  In so concluding, the Supreme Court relied on its previous decision in Apprendi v.

11   New Jersey, 530 U.S. 466 (2000).  Id.  In Apprendi, the Court had held "[o]ther than the fact

12   of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

13   statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

14   530 U.S. at 490.  In short, the Supreme Court has explicitly carved out an exception for prior

15   convictions–a sentencing court may consider prior convictions for purposes of enhancing a

16   sentence without having to submit them to a jury.  See Kessee v. Mendoza-Powers, 574 F.3d

17   675, 676-77 (9th Cir. 2009).

18   Here, the record shows petitioner admitted through his own trial testimony that he had

19   sustained five prior felony convictions arising from his 1983 rape of a juvenile (RT 769-70.)

20   Additionally, the trial court received into evidence certified copies of prison records,

21   including the abstract of judgment from petitioner's 1984 convictions as well as petitioner's

22   photograph and fingerprints. (CT 204, 277-85; RT 1016.)  On May 28, 2003, at petitioner's

23   sentencing hearing, the trial court denied petitioner's motion to strike the priors and stated it

24   _____

25       [22] Petitioner asserts various claims of ineffective assistance of counsel arising from
     counsel's failure to object to the above instances of "prosecutorial misconduct."  As
26   discussed, the Court has analyzed petitioner's prosecutorial misconduct claims and finds
     them unavailing.  There is nothing in the record to suggest any objection by defense counsel
27   would have had merit or that a successful objection would have in any way affected the
     verdict.  Petitioner thus fails to show ineffectiveness on the part of defense counsel and
28   further fails to demonstrate he was prejudiced thereby.  See Strickland, 466 U.S. at 687-88,
     694.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    was enhancing petitioner's sentence based on the prior strike convictions.  (RT 1253-54.)

2         The record makes clear that the state trial court enhanced petitioner's sentence based

3    on his prior strike convictions.  The trial court made no other factual findings to increase

4    petitioner's sentence.  Consequently, because it falls under the exception for prior

5    convictions, petitioner's enhanced sentence does not violate <u>Cunningham</u>.  <u>See</u> <u>Cunningham</u>,

6    549 U.S. at 288-89; <u>Apprendi</u>, 530 U.S. at 490; <u>Kessee</u>, 574 F.3d at 676-77.

7         Accordingly, petitioner is not entitled to habeas relief on this claim.

8         8.    <u>Sentencing Error</u>

9         Petitioner makes various challenges to his sentence under California's Three Strikes

10   Law.  (Pet. Attach. A at 62-66.)  Specifically, petitioner claims: (1) the trial court used only

11   evidence outside the record to find true the prior strike allegations; (2) the trial court coerced

12   petitioner into waiving his right to a jury trial on the prior strike allegations; and (3) the trial

13   court erroneously denied petitioner's motion to strike the prior strike allegations.  (<u>Id.</u>)  The

14   Court addresses each such claim in turn.

15        a.    <u>Evidence of Prior Convictions</u>

16        Petitioner claims "the trial court used only evidence outside the record of conviction

17   to find true the circumstances of the alleged prior crimes."  (Pet. Attach. A at 62.)  As noted

18   above, however, the trial court received into evidence petitioner's certified prison records,

19   including the abstract of judgment from petitioner's prior strike convictions (CT 204, 277-85;

20   RT 1016), and a photograph and fingerprints of petitioner were introduced to show he was

21   the person who had suffered the prior convictions (CT 284-85).  Also, as noted, petitioner

22   admitted through his own trial testimony that he had sustained, <u>inter alia</u>, the two prior felony

23   convictions that, under California law, constituted strikes.  (RT 769-70.)   Consequently,

24   there was sufficient evidence for the trial court to find beyond a reasonable doubt that

25   petitioner had multiple prior strike convictions.  <u>See</u> <u>United States v. Okafor</u>, 285 F.3d 842,

26   847-48 (9th Cir. 2002) ("Evidence of the prior conviction is sufficient if, viewing the

27   evidence in the light most favorable to the prosecution, any rational trier of fact could have

28   found the fact of the prior conviction beyond a reasonable doubt.")  Indeed, petitioner offers

United States District Court
For the Northern District of California

1   nothing to suggest such evidence was in any manner insufficient.

2          Accordingly, petitioner is not entitled to habeas relief on this claim.

3                  b.      Coercion

4          Petitioner claims "the trial court coerced petitioner into waiving his right to have a

5   jury trial to decide the alleged prior conviction." (Pet. Attach. A at 64.)  Such claim fails at

6   the outset because, as discussed above, petitioner has no federal constitutional right to a jury

7   trial on the issue of whether he suffered a prior conviction.  See Apprendi, 530 U.S. at 490;

8   Kessee, 574 F.3d at 676-77.

9          Moreover, the claim fails for lack of factual support.  Before petitioner's trial

10  commenced, the following exchange took place:

11          [Defense Counsel]: If [the prosecutor] rested without proving the
            priors, not knowing whether defendant's going to take the stand or not,
12          then that wouldn't be proved to the jury.  I mean, that's the–I would
            prefer that obviously because that would eliminate proof of the 1170.12.
13
            The Court: Right.
14
            [Defense Counsel]: That's why I'm saying that issue should be
15          bifurcated in order to avoid that situation.

16          The Court: Well, so here the scenario is we bifurcate at this point, she
            rests, your client takes the stand–I'm just hypothesizing–your client
17          takes the stand, the impeachment proof comes in, and then the question
            would be whether to allow her to reopen for the purpose of proving up the
18          prior convictions?

19          [Prosecutor]: Right.
20
            The Court: And I think we'll cross that bridge when we get there.
21
            [Petitioner]: Could we have just a moment, your Honor?
22
            The Court: About three minutes.
23
24  (RT 509-10.)  When the proceedings resumed, petitioner agreed to a bifurcated trial on his
    prior convictions:
25
            [Defense Counsel]: We're prepared to waive jury on the issue of the
26          truth of the 1170.12 allegations and have your Honor just hear the matter.
            And also the 667(a) violation, have your Honor hear that separately from
27          the jury without a jury obviously.

28          The Court: Okay. And suppose the–procedurally how will that

1    impact the trial?

2    [Defense Counsel]: Well, I think then–I mean, the bifurcation, we
     won't have the worry about the DA presenting evidence to the jury and at
3    the end of the case when the jury is excused after they–even while
     they're deliberating we can take up the trial of the priors before your
4    Honor and just have–make sure that the priors aren't mentioned to the
     jury unless the defendant testifies.
5
     The Court: All right. Sir, you have a right to have a jury trial to
6    determine the prior prison term, to determine the prior convictions as
     your attorney just indicated, and the suggestion here is that the Court hear
7    that rather than the jury thereby not having the jury become aware of the
     prior convictions at any stage in the proceedings, unless you testify of
8    course.

9    (RT 510-11.)  Petitioner then waived a jury trial on the prior convictions, and the trial court

10   accepted the waiver.  (RT 511-12.)  Such record shows petitioner and defense counsel

11   desired the bifurcation.  At the time he entered his waiver, petitioner apparently had not

12   decided whether or not he would testify in his own defense, and the trial court advised

13   petitioner that a decision to testify would expose him to impeachment with his prior

14   convictions.  There is no evidence petitioner was coerced into waiving a jury trial on the

15   strike priors.

16        Accordingly, petitioner is not entitled to habeas relief on this claim.

17             c.    Failure to "Strike the Strikes"

18        Petitioner claims the trial court "illegally denied" his motion to strike the prior

19   conviction allegations.  (Pet. Attach. A at 65.)  In People v. Superior Court (Romero), 13 Cal.

20   4th 497, 508 (1996), the California Supreme Court interpreted the language of California

21   Penal Code section 1385(a) and held a trial court may, on its own motion or motion of a

22   party, strike prior felony conviction allegations in a case brought under the Three Strikes

23   Law.  Petitioner makes no reference, however, to any federal law or constitutional provision

24   in support of his claim.  Rather, he alleges error solely under state law; consequently, the

25   claim is not cognizable on federal habeas review.  See Estelle, 502 U.S. at 67-68.

26        Accordingly, petitioner is not entitled to federal habeas relief on this claim.

27

28

44

United States District Court
For the Northern District of California

9.    Cumulative Error

Petitioner claims the foregoing asserted trial errors, when considered in combination, resulted in prejudice.  (Pet. Attach. A at 67.)  For the reasons discussed above, the Court has found no constitutional error exists, let alone multiple errors.  As there has been no error, there can be no due process violation based on a theory of "cumulative" error.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding, where there are no errors, there can be no cumulative error).

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

10.    Disproportionate Sentencing

Petitioner claims his twenty-five years to life sentence for inflicting corporal injury on a cohabitant was "disproportionate and greater than [the] legislature intended."  (Pet. Attach. A at 68.)  The Eighth Amendment to the United States Constitution provides there "shall not be . . . cruel and unusual punishment inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  Ewing v. California, 538 U.S. 11, 23 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)); see also Lockyer v. Andrade, 538 U.S. 63, 72 (2003) ("A gross disproportionality principle is applicable to sentences for terms of years.").  The Eighth Amendment does not preclude a state from making "a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime," as may occur under a recidivist sentencing statute.  See Ewing, 538 U.S. at 25, 29-30.  In determining whether a sentence is grossly disproportionate under such a statute, courts look to whether the "sentence is justified by the gravity of [the individual's] most recent offense and criminal history."  Ramirez v. Castro, 365 F.3d 755, 768 (9th Cir. 2004).

In Andrade, the Supreme Court upheld a Three Strikes sentence of two consecutive twenty-five years to life terms for a recidivist convicted of stealing approximately $150 worth of videotapes.  Andrade, 538 U.S. at 66, 77.  Andrade had a criminal history of petty

United States District Court
For the Northern District of California

theft, burglary, and transportation of marijuana.  Id. at 66.  Similarly, in Ewing, the Supreme Court upheld a Three Strikes sentence of twenty-five years to life for a repeat offender convicted of felony grand theft of three golf clubs worth approximately $1,200.  Ewing, 538 U.S. at 18-19, 30-31.  Ewing had a criminal history of theft, battery, burglary, possession of drug paraphernalia, illegal firearm possession, robbery, and trespass.  Id. at 18-19.  By contrast, the Ninth Circuit in Ramirez held a Three Strikes sentence of twenty-five years to life for the felony of petty theft with a prior conviction of petty theft was grossly disproportionate to the crime.  Ramirez, 365 F.3d at 767.  Ramirez's prior criminal history consisted solely of two convictions for second-degree robbery obtained by a single guilty plea, for which his total sentence was one year in the county jail and three years probation, and where the robberies were "nonviolent" shoplifting crimes.  Id. at 768.[23]

Here, petitioner was convicted of inflicting corporal injury on a cohabitant, a crime arguably more serious than the thefts in Andrade and Ewing.  In determining whether a sentence is grossly disproportionate under a recidivist sentencing statute, however, courts look not only at the most recent offense, but also at the petitioner's criminal history.  Ramirez, 365 F.3d at 768.  Unlike in Ramirez, where the petitioner's two prior strikes were nonviolent shoplifting crimes, petitioner's prior strikes were for rape and oral copulation by force on a 13-year-old girl whom petitioner had snatched off of a bicycle.  (CT 212, 217; RT 1253-54.)[24]  Given the sentences that have been upheld by the Supreme Court, petitioner's sentence cannot be deemed "grossly disproportionate" to his crimes.

Accordingly, petitioner is not entitled to habeas relief on this claim.

11.    Ineffective Assistance of Appellate Counsel

Petitioner claims his appellate counsel should have raised the issues discussed above that were not presented on direct appeal.  (Pet. Attach. A at 71.)

---

[23]  The "force" used in the crimes of shoplifting–the basis for a charge of robbery–was Ramirez's act of pushing a K-Mart security guard out of his way as he fled the store and a minor injury caused when his accomplice, in fleeing, drove over the foot of a security guard.  Ramirez, 365 F.3d at 769.

[24]  Petitioner also had a conviction for grand theft.

**United States District Court**
For the Northern District of California

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant effective assistance of counsel on his first appeal.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed in accordance with the standard set out in Strickland.  See Strickland, 466 U.S. at 668; Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner thus must show he received representation that fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 1434 & n.9.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a criminal defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  Miller, 882 F.2d at 1434.  Consequently, appellate counsel "frequently will remain above an objective standard of competence" and, for the same reason, will have caused the client no prejudice, specifically, because he or she "declined to raise a weak issue."  Id.

In the instant case, because none of the claims discussed herein are meritorious, any failure on the part of counsel to raise them on appeal was neither deficient assistance nor prejudicial to petitioner.

Accordingly, petitioner is not entitled to habeas relief on this claim.

C.    Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

A judge may grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would

47

find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v.</u> <u>McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing and, accordingly, a certificate of appealability will be denied.

## CONCLUSION

For the reasons stated above, the Court orders as follows:

1.  The petition for a writ of habeas corpus is hereby DENIED.

2.  A certificate of appealability is hereby DENIED.

3.  The Clerk is directed to substitute Warden P.D. Brazelton as the respondent in this action.

The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: February 21, 2012

MAXINE M. CHESNEY
United States District Judge